# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>DESERT SPRINGS EQUESTRIAN CENTER, LLC,<br><br>                     Debtor.<br>FIRST NATIONAL ACCEPTANCE COMPANY,<br><br>                     Plaintiff,<br>v.<br>DESERT SPRINGS EQUESTRIAN CENTER, L.L.C.,<br><br>                     Defendant. | Chapter 11<br><br>No. 4:10-bk-30267-JMM<br><br>Adversary No. 4:11-ap-00600-JMM<br><br>**MEMORANDUM DECISION** |

      An oversecured creditor, Plaintiff First National Acceptance Company ("FNAC") with an interest in the Debtor Desert Springs Equestrian Center, L.L.C.'s ("Desert Springs") real property, seeks an award of fees in the amount of $164,865.00. It also asks for an award of costs in the sum of $2,970.67 (ECF No. 25).

      Desert Springs responded, and maintains that the court should award FNAC nothing.

      Therefore, the court, in order to properly evaluate this factual dispute, must review FNAC's attorney's time entries, and in so doing, review the Desert Springs' two bankruptcy cases, and all related proceedings (including this adversary proceeding), start to finish, to determine if FNAC has shown a right to fees in the amount requested.

The parties have fully briefed and supported their respective positions, and made argument on the issues on June 19, 2012. After that hearing, the court took the matter under advisement.

## JURISDICTION

This court has core jurisdiction over fee disputes, which are requested expenses of an oversecured creditor. 11 U.S.C. §§ 157(b); 506(b).

## ISSUE

What amount is reasonable for attorneys' fees and costs charged by attorney Constance Sutton on behalf of secured creditor FNAC?

## PROCEDURE

Desert Springs has filed two voluntary Chapter 11 bankruptcy petitions.

The first was filed on December 21, 2009, and was dismissed on September 13, 2010 (as Case No. 4:09-bk-32851-JMM). No reorganization plan was confirmed.

The second case was filed a few days later, on September 22, 2010 (4:10-bk-30267-JMM), and ended with a confirmed plan on June 21, 2012. As part of that plan, the secured creditor, FNAC, was fully paid its principal and interest, and a sum of money was reserved, pending a determination of the amount and appropriateness of attorneys' fees and costs.

### A. Introduction

Fee disputes are always difficult for a court. This is because, when called upon to do so, a court must make an effort to understand what was happening at every stage of the proceeding,

and apply its experience and judgment to the time allocated for a particular task. When an objection to fees occurs, a court must review the entire case--or cases--from beginning to end. This is a long, slow and tedious process, subjective in nature, and fully fact-specific. The only bright side to undertaking such a lengthy process is that it is essentially appeal-proof, because, if done correctly, no credible argument could be sustained that a court's findings are either "clearly erroneous" or an abuse of discretion.

In all cases, it is helpful if the opposing party can specifically identify which features of a fee application it feels are unreasonable. Here, however, Desert Springs has focused only on a few entries, failed to identify many meaningful entries which it feels were neither reasonable nor earned, and yet maintains that FNAC should receive absolutely nothing. Instead, Desert Springs' principal argument that FNAC's law firm pursued a non-meritorious position--even though it was Desert Springs that caused most of that litigation with numerous defenses and eventually conceded that the FNAC claim was to be paid in full. Desert Springs chose not to litigate its many defenses, at all.

In this context, Desert Springs argues that FNAC's counsel should be awarded absolutely nothing for fees. This is far from a reasonable response.

Thus, from Desert Springs' side, the court really was not given much to work from, because its position is that the fee should be zero. Desert Springs has taken an all-or-nothing approach to the problem.

The court has independently reviewed the matter. After undertaking a dispassionate review of the events in the case(s), the court now decides what fee, if any, is appropriate.

### B. Attorneys' Fees and Costs--Generally

What the parties must recognize at the outset is that, in determining what is a reasonable fee to be paid to counsel, a court must attempt to place itself in the position of a "reasonable" creditor and its attorneys. Some hindsight is obviously helpful, but the most important thing is to place oneself in the shoes of the attorneys at the time the work was being done, and assess

whether the work performed was necessary at the time, or if necessary, whether too much time was expended for the tasks at hand. In other words, "a bankruptcy court must examine the circumstances and manner in which services are performed and results achieved to determine a reasonable fee." In re Garcia, 335 B.R. 717, 724 (9th Cir. BAP 2005) (citing In re Mednet, 251 B.R. 103, 108 (9th Cir. BAP 2000)).

More than almost any other proceeding in bankruptcy, a decision on an attorneys' fee request rests within the sound discretion of the trial judge and will not be disturbed unless it abuses its discretion or erroneously applies the law. See Garcia, 335 B.R. at 723 (citing In re Strand, 375 F.3d 854, 857 (9th Cir. 2004)). Courts, in looking at the reasonableness of an attorneys' fee claim in a bankruptcy proceeding, have stated that it is "inherently unreasonable" to incur fees that are not cost-justified either by the economics of the situation or as necessary to preserve the particular party's interest in light of the legal issues involved. See, e.g., In re Wonder Corp. of America, 72 B.R. 580, 588 (Bankr. D. Conn. 1987) (discussing reasonableness of § 506(b) fee request); In re Nicfur-Cruz Realty Corp., 50 B.R. 162, 169 (Bankr. S.D.N.Y. 1985) (same); see also In re Crowley, 293 B.R. 628, 632 (Bankr. D. Vt. 2003) (stating that § 330 reasonableness analysis applies to a secured creditor's § 506(b) attorney's fee request).

### C. The Standards

Section 330(a)(1)(A) is a section of the Code that applies to officers of an estate. However, the standards of reasonableness set forth for court-appointed officers are also helpful and applicable to a secured creditor's § 506(b) request. Section 330 provides that an attorney may be awarded "reasonable compensation for actual, necessary services" rendered by the attorney. This section also states, in relevant part:

> (a)(3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including -

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). In examining the circumstances and manner in which services are performed and results achieved to determine a reasonable fee, the court considers:

(a) Were the services authorized?

(b) Were the services necessary or beneficial to the administration of the estate at the time they were rendered?

(c) Are the services adequately documented?

(d) Are the fees required reasonable, taking into consideration the factors set forth in section 330(a)(3)?

(e) In making the determination, the court must consider whether the professional exercised reasonable billing judgment.

Garcia, 335 B.R. at 724 (citing In re Mednet, 251 B.R. at 108). In exercising reasonable billing judgment, the professional must consider:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the services are not rendered?

(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

Mednet, 251 B.R. at 108 n. 7 (citing Unsecured Creditors' Committee v. Puget Sound Plywood, Inc., 924 F.2d 955, 959 (9th Cir.1991)).

Section 330(a)(4) also provides a guide to that which is not compensated:

(a)(4)(A) [T]he court shall not allow compensation for . . .

(i) unnecessary duplication of services; or

(ii) services that were not –

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

In Garcia, the Ninth Circuit BAP confirmed rejection of a standard that services are only compensable if they result in a material benefit to the estate. It held that under § 330, a professional need only demonstrate that the services were "reasonably likely to benefit the estate" at the time rendered. Garcia, 335 B.R. at 724. Thus, benefit to the estate is not restricted to only a monetary benefit. See In re Crown Oil, Inc., 257 B.R. 531, 540 (Bankr. D.Mont. 2000), quoting In re Kohl, 95 F.3d 713, 714 (8th Cir. 1996)).

"Another important consideration is whether the services rendered 'promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of the bankruptcy cases and related adversary proceedings.'" Crown Oil, 257 B.R. at 540 (quoting In re Spanjer Bros., Inc., 203 B.R. 85, 90 (Bankr. N.D.Ill. 1996)).

Case 4:11-ap-00600-BMW   Doc 35   Filed 07/17/12   Entered 07/18/12 11:15:19   Desc
Main Document - Application for Attorney Fees   Page 6 of 15

6

"Whether a reorganization is successful is a factor to be considered in determining whether a debtor's counsel's services provide a benefit to the estate." Crown Oil, 257 B.R. at 541 (citations omitted). "The Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate." Crown Oil, 257 B.R. at 541, quoting In re Hunt, 124 B.R. 263, 267 (Bankr. S.D.Ohio 1990). "Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk." Crown Oil, 257 B.R. at 541 (quoting In re Offield, 128 B.R. 548, 550 (Bankr. W.D. Mo. 1991)).

In measuring reasonableness of fees, numerous judicial philosophies combine to assist a court. In addition to a judge's own experience, a court can draw upon the "lodestar" method (lawyer time multiplied by an hourly rate), application of factors, and a host of other judicial comments upon the subject. See generally, In re Pettibone Corp., 74 B.R. 293 (Bankr. N.D. Ill. 1987).

A case which is generally cited for setting forth "twelve rubrics" for a trial court to consider, in its determination of what constitutes a reasonable fee, is Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). Those twelve factors, however, are not "self-actuating: simply to articulate those twelve factors ... does not itself conjure up a reasonable dollar figure in the mind of the district judge." In re Jensen-Farley Pictures, Inc., 47 B.R. 557 (Bankr. Utah 1985) (quoting from In re Casco Bay Lines, 25 B.R. at 754). As Judge Allen noted in Jensen-Farley:

> In general, the statutory factors under Section 330 and the Johnson factors consist of three components: (1) the quantity factor, comprised of documented time at customary billing rates; (2) the quality factor, comprised of the competency of the representation, taking into account the novelty and difficulty of the issues presented, the skill required, the time constraints, and the personal qualifications of the applicant; and (3) the result factor, comprised of the actual results achieved in the case.

Id. at 587.

In the case of In re Casco Bay Lines, Inc., 25 B.R. 747 (Bankr. 1st Cir. 1982), the Bankruptcy Appellate Panel for the First Circuit stated that a court's initial approach, in determining a reasonable fee, is to multiply the number of hours reasonably expended on the case by a reasonable hourly rate. This is known as the "lodestar fee setting approach." However, as the Casco Bay Lines court stated, it is the quality of representation and the results that are most significant in determining the amount of the fee:

> It is under the heading "quality of representation" that a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding, and the benefit to the estate to see if circumstances warranted adjustment of the lodestar figure. Where an attorney's services have produced particularly exceptional benefits for the estates, an upward adjustment of the lodestar may be warranted to compensate for an hourly rate that turned out to be overly conservative. Similarly, if a high-priced attorney performs at a competent but undistinguished manner, a decrease in the hourly rate would be warranted.

Id. at 756.

The trial court has discretion in awarding what it considers to be a reasonable fee. A court's discretion "means a sound discretion ... exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." In re AWECO, Inc., 725 F.2d 293, 298 (5th Cir. 1984) (review of bankruptcy approval of a compromise application).

The First Circuit said in Boston and Maine Corp. v. Moore, 776 F.2d 2, 9 (1st Cir. 1985):

> To determine the number of hours "reasonably" spent, as well as in setting a "reasonable" hourly rate, a court must review the work to see whether "counsel substantially exceeded the bounds of reasonable effort," ... and should dis-allow hours that were "duplicative, unproductive, excessive, or otherwise unnecessary.

8

Case 4:11-ap-00600-BMW   Doc 35   Filed 07/17/12   Entered 07/18/12 11:15:19   Desc
Main Document - Application for Attorney Fees    Page 8 of 15

# APPLICATION OF LAW TO THE FACTS

Considerations of fairness, results obtained, difficulties encountered, novelty of issues presented and time and experience of those involved must all be weighed. In order to do this job properly, the case must be scrutinized from top to bottom. So before beginning the day-by-day, month-by-month review of FNAC's counsel's efforts to collect its payments due under the promissory note signed by Desert Springs, the court must review that status of all legal proceedings which either directly or tangentially pulled FNAC into this tangled web.

# BACKGROUND

## 1. General

The dispute between the parties has been simmering for approximately three and one-half years. During that time, FNAC declared default(s) under the promissory note owned by it, Desert Springs filed two chapter 11 cases, an adversary proceeding was initiated and prosecuted to resolve questions over FNAC's entitlement to be paid under the note, and ancillary legal skirmishes drew in other individuals, Michael Ellzey and Kristine J. Ryan, who filed their own individual chapter 13 case.

At each stage, FNAC had to react to issues advanced by Desert Springs, and had to act, through its attorney, to each tactic and to each legal turn in the long road.

## 2. Note and Deed of Trust

The history of this matter began in August, 2005, when Ellzey and Ryan sold the equestrian center to Desert Springs.

The property involved in this dispute is a multi-acre equestrian center located within the town limits of Marana, Arizona.

On August 16, 2005, Desert Springs, through its "manager," L.P. Bonita Enterprises, LLC, executed a promissory note for $816,500. This note was signed by Lorilei Peters, the individual behind both Desert Springs and L.P. Bonita. The note was made payable to Michael W. Ellzey and Kristine J. Ryan. It bore interest at 8% per annum, and was secured by the real property constituting the equestrian center and grounds.

The note was for a ten-year term, and called for payments to be made every six months (February and August) of $60,079.75 each. Any balance remaining at the end of the ten-year term was to be paid in full at maturity. The note was "non-recourse," meaning that in the event of default, Desert Springs (the note's maker) would not incur any personal liability.

At some point, approximately May 24, 2007, the note was assigned by Ellzey and Ryan to FNAC, as well as the beneficial interest in the deed of trust securing the debt (Proof of Claim No. 9 filed in Case No. 10-bk-30267). (Exs. 5 and 6 to Adv. 11-ap-600, ECF No. 1).[1]

In the meantime, Desert Springs learned of a series of problems plaguing the property, and blamed Ellzey and Ryan for not informing it of these issues prior to closing. As a result of these compounding difficulties, the cash flow from the equestrian business was curtailed, and Desert Springs became unable or unwilling to make payments on the note--now held by FNAC (Desert Springs Disclosure Statement, ECF No. 69, Case No. 10-bk-30267).

### 3. **Foreclosure Action**

With the February, 2009, payment not being paid, FNAC began trustee's sale proceedings in approximately August or September, 2009. By then, Desert Springs had failed to make the August payment as well.

A trustee's sale was set for December 23, 2009.

---

[1] The pleadings reflect that FNAC took assignment of less than all of the payments due under the note, until the "string" of payments--a sum less than all--was repaid to it. The details of that arrangement are not critical to the decision in this case. This is because when Desert Springs defaulted, the whole note became due. It could be cured, however, by payment only of the amounts then due. ARIZ. REV. STAT. § 33-801 et seq. Eventually, Desert Springs paid FNAC what it was due, and obtained a release of any further obligations to Ellzey and Ryan.

10

Case 4:11-ap-00600-BMW    Doc 35    Filed 07/17/12    Entered 07/18/12 11:15:19    Desc
Main Document - Application for Attorney Fees    Page 10 of 15

Desert Springs' first chapter 11 case was filed on December 21, 2009, effectively blocking the trustee's sale with the automatic stay of 11 U.S.C. § 362(a).

### 4. Desert Springs' First Bankruptcy Case (4:09-bk-32581-JMM)

As noted, Desert Springs filed a voluntary chapter 11 case on December 21, 2009. That case contains 73 docket entries. However, Desert Springs' case was dismissed on September 13, 2010, for its "inability to confirm a plan" (ECF No. 70).

During this nine-month case, FNAC filed a motion for stay relief, which was opposed by Desert Springs.

No associated adversary proceedings were filed by Desert Springs against either FNAC or the Ellzey and Ryan parties.

### 5. Ellzey and Ryan Bankruptcy (4:10-bk-01572-EWH)

Shortly after Desert Springs filed its chapter 11 case, the sellers of the equestrian center, Michael Ellzey and Kristine J. Ryan, filed a personal chapter 13 case. That filing occurred on January 21, 2010, one month after Desert Springs' first bankruptcy filing.

On April 28, 2010, L.P. Bonita (and Desert Springs), brought an adversary proceeding against Ellzey and Ryan for non-dischargeability, alleging misrepresentation in the sale of the equestrian center to Desert Springs. An answer was filed and the issues were joined, and the matter was set for trial. However, as the matter moved toward trial, Desert Springs changed counsel, while simultaneously trying to settle. Desert Springs' attorney, Craig Keller, withdrew from the adversary proceeding on November 3, 2010 (Adversary ECF No. 18).

Desert Springs' new counsel, Eric Slocum Sparks, first began to appear in the Ellzey and Ryan administrative case in September, 2010.

Eventually, on May 31, 2011, the adversary case was settled, with Ellzey and Ryan withdrawing their claim in the second Desert Springs chapter 11 case (4:10-bk-30267-JM), and

Case 4:11-ap-00600-BMW    Doc 35   Filed 07/17/12   Entered 07/18/12 11:15:19    Desc
Main Document - Application for Attorney Fees    Page 11 of 15

the parties executed mutual releases against each other (ECF Nos. 25, 29, 31, 33). This settlement relieved Desert Springs of the piece of the obligation due to Ellzey and Ryan, an amount in excess of half a million dollars.

FNAC never appeared in the Ellzey and Ryan case, did not file a claim therein, and did not make an appearance therein. Nonetheless, its counsel monitored the events in that case, as eventually it also became indirectly drawn into Desert Springs' feud with Ellzey and Ryan.

### 6. Desert Springs' Second Bankruptcy Case (4:10-bk-30267-JMM)

Desert Springs filed its second chapter 11 bankruptcy case immediately on the heels of the dismissal of its first case, on September 22, 2010. This was only one week after dismissal of the first case. This case now has 146 docket entries.

Eventually, one year and eight months after filing, Desert Springs was able to confirm a reorganization plan (ECF No. 144).

The final chapter in the dispute between Desert Springs and FNAC was resolved by Desert Springs finding a way in which to pay the secured debt in full (see Order confirming plan, ECF No. 144). As for the only remaining issue, FNAC's attorneys' fees and costs, the plan provides: "Debtor agrees to pay the balance of the Class Nine attorney's fees and costs after the Court has made a determination of amounts owed."

This final chapter, however, was written only after months of acrimonious litigation between the parties, the commencement of an adversary proceeding by FNAC, and Desert Springs' counsel's reluctance to acknowledge the assignment and acquiesce to FNAC's rights in and to the note and deed of trust assigned to it. In fact, Desert Springs' answer to the adversary complaint requested affirmative relief that FNAC had "no right to collect" the note, that Desert Springs had "setoff and recoupment" rights, that the value of the secured property was at issue, that the note and deed of trust endorsements had "no force and effect," that Desert Springs "satisfied" the note and that the sums claimed to be due FNAC were erroneous. Its prayer called, effectively, for rescission and a declaration of satisfaction of the debt. In addition,

Desert Springs sought to hold FNAC responsible for all of the Ellzey and Ryan representations made in the sale between Desert Springs and Ellzey and Ryan--to which FNAC was never a party.

In short, Desert Springs' answer set the stage for a full-blown, all-out, evidence-ridden trial on the merits.

The parties then proceeded to the discovery stage, while stipulating to continue the trial no fewer than nine (9) times.

Eventually, the matter was settled and the plan confirmed, with Desert Springs finding the means to simply pay off FNAC's claimed obligation. Thus, all of Desert Springs' contentions against FNAC, after much sound and fury, ended with a whimper, not a bang.

## Epilogue

That brief history of the evolution of these proceedings brings us to the decision of the issue before us, "Is FNAC entitled to attorneys' fees, and if so, in what amount?

To determine this issue, the court has reviewed FNAC's counsel's efforts, month by month, and reviewed Desert Springs' arguments as they may relate to any particular item of legal effort.

## FNAC'S APPLICATION FOR FEES

FNAC filed an application, and an amended application, for fees, on April 25 and May 10, 2012 (ECF Nos. 24, 25). The application contained a detailed narrative of FNAC's counsel's involvement at every stage of these inter-related and complex proceedings.

In addition, FNAC's counsel included her time entries from December 8, 2009 through March 16, 2012. These entries cover 2 1/3 years of legal involvement. The entries detail not only attorney Sutton's efforts, but also those of her paralegal staff.

13

Case 4:11-ap-00600-BMW    Doc 35    Filed 07/17/12    Entered 07/18/12 11:15:19    Desc
Main Document - Application for Attorney Fees    Page 13 of 15

Negotiating FNAC's way through all of Desert Springs' complex, shoal-ridden waters has not been an easy task for its attorney. In fact, it has been extremely difficult, especially considering having to deal with different attorneys and Desert Springs' many conspiracy theories against FNAC. These Debtor-created bogeymen have caused this secured creditor, which merely held an assignment of a promissory note and a deed of trust, to be pulled in multiple directions by, essentially, an unresponsive and angry Debtor, down a series of paths that cost FNAC time and a great deal of money.

This court has no issues with attorney Constance Sutton's legal abilities, her professionalism and her expertise in the area of creditor-debtor law. She has almost three decades of experience in this specialized area. She has only a well-earned, solid reputation in her chosen specialty. Her hourly rates are reasonable, as are those of her paralegals.

The time Ms. Sutton and her staff has spent on this case, through each tedious month of involvement, has been reasonable and proportionate to the matters faced by her client. Nothing contained in her time summaries show over-reaching nor excessive or unnecessary effort.

This was a case made more difficult by a recalcitrant Debtor who chose to retaliate, for the Ellzey and Ryan foibles, against a party which took an assignment of a straightforward promissory note, and gave consideration therefor.

Month after month, year after year, FNAC was dragged from what began as a simple, non-judicial deed of trust foreclosure, through three bankruptcies (two by Desert Springs and one by Ellzey and Ryan), and was forced to file an adversary proceeding only to be confronted by a massively complex assertion of multiple defenses.

Eventually, when push finally came to shove, Desert Springs merely capitulated, releasing its claims of FNAC's impropriety like the air let out of a balloon.

It appears that all of the fees generated by FNAC were reasonable, and taken only in efforts to move FNAC's claims forward to obtain payment or to foreclose upon its collateral in the face of a defaulted promissory note. Moreover, all other fees incurred were due to defending against the positions taken by Desert Springs--through two bankruptcies and its (never-pressed) "defenses" to FNAC's adversary proceeding.

Case 4:11-ap-00600-BMW    Doc 35    Filed 07/17/12    Entered 07/18/12 11:15:19    Desc
Main Document - Application for Attorney Fees    Page 14 of 15

14

Desert Springs' arguments against awarding FNAC's fees and costs are not persuasive. Had Desert Springs felt its defenses were meritorious, it could have litigated them in the context of the adversary proceeding, not now--when fees are on the line.

## **CONCLUSION**

After a complete, thorough and detailed review of the entirety of all of the related files, the court FINDS AND CONCLUDES that counsel for FNAC, Constance Sutton, is entitled to reasonable fees of $164,865.00 and costs of $2,970.67. Counsel for Desert Springs will be ordered to pay such fees and costs from the sums held in the trust account for said purpose. The attorneys shall cooperate in determining the final amount due, as the court recalls that some portion may already have been paid.

A separate order will be entered. FED. R. BANKR. P. 9021. Any party aggrieved must appeal within 14 days of the docketing of such order. No stay of that order will be impacted by any appeal, unless a stay pending appeal is sought and obtained, in the first instance, by the bankruptcy judge. FED. R. BANKR. P. 8005.

DATED AND SIGNED ABOVE.

COPIES to be sent by the Bankruptcy Noticing
Center ("BNC") to all parties to this adversary

Case 4:11-ap-00600-BMW   Doc 35   Filed 07/17/12   Entered 07/18/12 11:15:19   Desc
Main Document - Application for Attorney Fees    Page 15 of 15

15